UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

BRIAN J. JONES,
      **Plaintiff,**

  v.                                    Case No. 19-C-1774

THEODORE ANDERSON, KYLE FERSTL,
NATHAN FOSSHAGE, JAMIE DUTTON,
ERIC FOX, and JOSHUA BENDER
      **Defendants.**

## ORDER

Plaintiff Brian J. Jones, who is confined at the Columbia Correctional Institution, sued the defendants under 42 U.S.C. § 1983 alleging that they violated his constitutional rights by using excessive force against him, strip searching him, and placing him in a dirty cell with limited property. The defendants have filed a motion for summary judgment. This decision grants the defendants' motion and dismisses this case.

## I. BACKGROUND

The plaintiff was confined at the Columbia Correctional Institution (Columbia), a Wisconsin Department of Corrections (DOC) facility, during the times relevant to this case. Defendant Theodore Anderson was employed as a supervising officer 1 (lieutenant); defendants Kyle Ferstl and Nathan Fosshage were employed as sergeants; and defendants Eric Fox, Joshua Bender, and Jamie Dutton were correctional officers at Columbia at all times relevant.

On May 20, 2019, Lieutenant Anderson was working as the first shift lieutenant at Columbia. That morning, Sergeant Craft (not a defendant) notified Anderson that the plaintiff was refusing to go to his cell, which was in Housing Unit 5, General Population.

According to the Incident Report, the plaintiff had begun to yell and swear at staff when staff advised him what cell he would be going to and he repeatedly said that he would not go to any cell that required him to use stairs. Defs.' Proposed Findings of Fact (PFOF), ECF No. 49, at ¶15, Ex. 1000 at 001-002.[1] Sergeant Craft advised Lieutenant Anderson that the plaintiff Jones had a "low bunk low tier restriction," which Anderson verified.

Lieutenant Anderson responded to the dayroom in Unit 5 to speak to the plaintiff. Anderson advised the plaintiff that he was aware that he had a low bunk low tier restriction, but that all the units had stairs and he would be required to use them. According to the Incident Report, the plaintiff stated, "Well I ain't going to that cell. I don't know what is so hard for you to understand, but you will have to carry me wherever we go." Defs.' PFOF at ¶20, Ex. 1000 at 002.[2] The Incident Report also states that the plaintiff began to swear at staff saying they were "fucking idiots and it shouldn't be this fucking hard." Defs.' PFOF at ¶21, Ex. 1000 at 002.[3] Lieutenant Anderson advised the plaintiff that he needed to stop swearing at staff and calm down.

Lieutenant Anderson was joined by Officer Dutton and Sergeant Ferstl. Anderson directed Officer Dutton and Sergeant Ferstl to place the plaintiff into double locked wrist restraints, which they did. Anderson then asked the plaintiff if he would comply with a strip search and placement into his cell. The plaintiff stated that he would comply with a strip

---

[1] The plaintiff denies yelling or swearing at staff, but his cited evidentiary material does not support his assertion.

[2] The plaintiff agrees that he said he would need to be carried down the stairs but he denies saying that he "ain't going to that cell" and that "you will have to carry me wherever we go." However, the plaintiff's cited evidentiary material does not support his assertion.

[3] The plaintiff disagrees with this proposed fact, but the cited evidentiary material does not support his assertion.

search but that they would have to carry him to his cell. Lieutenant Anderson called for a restraint chair to be brought to Housing Unit 5 and advised the plaintiff that due to his stated refusal to walk, and his continued insistence that staff must carry him, he would be escorted to the RHU by way of the restraint chair.

The defendants submitted a disc containing audio and visual body camera footage from the incident.[4] ECF No. 50-2, Ex. 1001. The footage begins when the plaintiff was sitting at the dayroom table, about one minute and ten seconds before he was placed in the restraint chair. Before the plaintiff was placed in the restraint chair, Lieutenant Anderson ordered him to stay seated at the dayroom table and told him he needed to watch his language, not raise his voice, and not get upset. At Lieutenant Anderson's direction, Officer Dutton placed double locked leg restraints on the plaintiff. Anderson directed the plaintiff to stand up and Sergeant Ferstl assisted him to do so.

The plaintiff was escorted to the restraint chair and Sergeant Ferstl let the plaintiff sit in the chair with only a grip on him. Ex. 1001, at 01:08.[5] When the plaintiff sat down in the restraint chair, he began to swear and yell that he had a bad back, to check his medical records, and that the handcuffs had cut through his wrists. When Sergeant Ferstl and Sergeant Fosshage were putting the chair safety belt across the plaintiff's waist, Lieutenant Anderson directed them to tighten it. The plaintiff asked for the names of

---

[4] The plaintiff also submitted a disc. ECF No. 61. The plaintiff's disc contains three audio and visual files of the incident. One of the files (DOC 032) is identical to the one the defendants submitted, including pauses periodically throughout the footage. The other two files show portions of the incident, are taken from a different perspective than the body camera footage the defendants submitted, and do not include pauses.

[5] The plaintiff says that he was pushed into the chair, but the video does not support this assertion.

everyone present, and Anderson told him those names would be in the reports. The plaintiff was then escorted in the restraint chair backwards to the RHU by Sergeant Fosshage, Sergeant Ferstl, Officer Dutton, and Lieutenant Anderson. Anderson radioed control to notify them of the escort and he asked Captain Julson to meet him in the hallway with a video camera.

Upon arrival in the RHU hallway, Captain Julson handed Lieutenant Anderson a video camera. Anderson began a video recording and gave the camera to Officer Dutton. Officers Bender and Fox joined the escort. The plaintiff was taken to the back of the observation area. Prior to being released from the restraint chair, Lieutenant Anderson directed that the plaintiff's knee brace and glasses be removed. He was escorted to the observation area shower where Sergeant Ferstl conducted a staff assisted strip search.

For the strip search, the plaintiff's jacket and two shirts were removed using the rescue knife and his clothing was lowered to his ankles. A second set of leg restraints was applied above his clothing. The first set of leg restraints was then removed followed by all of his clothing. Sergeant Ferstl searched the plaintiff's hair, ears, mouth, armpits, and feet, resulting in no contraband being found. Sergeant Ferstl conducted the staff assisted strip search while explaining to the plaintiff on what he was doing. Officers Bender and Fox secured the plaintiff's arms during the search. Lieutenant Anderson was present to observe the plaintiff and the security staff during the strip search. Officer Dutton, a female officer, was present to record the strip search on the handheld video camera. The plaintiff's back was to the camera during the search and there were no other female officers present.

After the search, a towel was placed around the plaintiff's waist, and he was placed in the restraint chair. The plaintiff held the towel together at his back, where his hands were cuffed together. There were brief moments in which the camera footage showed plaintiff's nudity underneath the towel and the towel fell at one moment. However, these brief seconds were quickly blocked from the camera's view by other officers.

Because the plaintiff complained that his wrist was bleeding, along with various other concerns, he was escorted to the RHU medical exam room. Once there, the plaintiff explained his medical conditions and concerns with the security staff to Nurse Franks, who then completed a medical assessment. Because the plaintiff was secured in a restraint chair, Lieutenant Anderson asked Nurse Franks to wait to look at the plaintiff's wrists until he arrived at his RHU cell and was removed from the restraint chair.

The plaintiff was escorted into the RHU and removed from the restraint chair. Nurse Franks looked at the plaintiff's wrists and said that she did not see any blood and that she would schedule him for a follow up for further assessment. Nurse Franks found no other signs of injury and cleared the plaintiff for placement in a cell. He was then escorted down the stairs and secured into a cell. The plaintiff was given a smock and mattress and was told that he could receive additional property by displaying positive behavior.

The plaintiff was placed on "Controlled Separation Status" due to his behavior during the cell transfer and he was issued a conduct report. The plaintiff remained in the RHU until May 22, 2019, when he was returned to General Population. On Controlled Separation Status, an inmate will have limited property and will be monitored by staff every thirty minutes. Property allowed during this time is normally a smock and a mattress.

5

Additional property may be given or removed based on an inmate's behavior. The plaintiff was not given clothing at the time of his placement due to his behavior. He could gain access to property by showing positive behavior.

On May 20, 2019, Officer Fox was working on first shift in the RHU. That morning, Fox was notified by Sergeant Schneider that the plaintiff was being escorted to RHU 1 from Housing Unit 5 for a disturbance he was causing and that he had a low bunk low tier restriction. Cell 01 was on a low tier of the prison consistent with plaintiff's restrictions. Officers Bender and Fox began to prepare cell 01 for the plaintiff to be housed in. All cells are cleaned by staff or inmate janitors upon an inmate's transfer or movement to another cell. Fox inspected cell 01 and he did not have any concerns related to its cleanliness.

## II. DISCUSSION

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### A. Excessive Force

The defendants contend that the plaintiff cannot produce evidence supporting his claim that the defendants used excessive force and that any force used against the plaintiff was not excessive. The plaintiff contends that excessive force was used by Ferstl when yanking the plaintiff's arms behind his back to handcuff him in the dayroom; when Ferstl and Fosshage pushed the plaintiff into the restraining chair; by Anderson's directive

6

to "make it tight" when strapping the plaintiff into the restraining chair; by Dutton when she strapped the plaintiff's legs into the restraining chair; by Fox and Bender as they manhandled the plaintiff out of the restraint chair and holding him for the strip search. The plaintiff asserts that he was compliant throughout the entire incident and he never resisted. ECF No. 60 at 11.

The Eighth Amendment's Cruel and Unusual Punishments Clause prohibits "unnecessary and wanton infliction of pain" on prisoners. *Hudson v. McMillian*, 503 U.S. 1, 5 (1992). In cases involving the use of excessive force, the question is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 7. Factors in determining whether the use of force was wanton and unnecessary include "the need for an application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)).

Often circumstances require prison officials to balance the need "to maintain or restore discipline" and the risk of injury to inmates. *Hudson*, 503 U.S. at 6. Both situations require officials to act quickly and decisively. *Id.* Likewise, both implicate the principle that "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (internal citations and quotations omitted.)

The plaintiff contends that he tried to obtain a video from the dayroom in general population to show what happened before the video footage that is in record began. The

plaintiff states that this video footage would have shown his compliance and would have disputed any alleged statements made by the defendants prior to where the body camera video started. According to the plaintiff, he complied the entire time so the defendants should not have needed to use any force. He states that his injuries were caused by the restraints and that the prison nurse did not properly evaluate his injuries.

The plaintiff was taken to the RHU after he caused a disruption in the dayroom. He was taken to the RHU in a restraint chair because he said he could not walk down stairs. He was tightly strapped into the restraint chair which defendants claim was for his own safety. Plaintiff does not allege the straps were too tight or that they were tightened maliciously. Contrary to the plaintiff's assertions, the video shows that Officer Dutton and Sergeant Ferstl worked slowly to secure the plaintiff and then move him to the restraint chair. While the plaintiff yelled about his bad back and his wrist upon sitting down in the restraint chair, the video shows the plaintiff slowly sitting down, with a hand on his shoulder. The video does not support the plaintiff's assertion that he was pushed into the chair. And to the extent that the plaintiff asserts that his handcuffs had cut through his wrist, Nurse Franks completed a medical assessment of the plaintiff when he arrived in the RHU, looked at his wrists, and noted that they were not bleeding. The videotape evidence, and Nurse Franks' assessment of the plaintiff's condition, make clear that no defendant used excessive force against the plaintiff.

When a party's assertion is contradicted by an objective record, such as a videotape, courts must view "the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (holding that if one account of the facts "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not

adopt that version of the facts for purposes of ruling on a motion for summary judgment");
*Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016) (relying on video from a dashboard camera rather than the non-moving party's account to grant summary judgment because the video clearly depicted the physical confrontation in question). A reasonable factfinder could not conclude that excessive force was used against the plaintiff.

**B. Strip Search**

The defendants argue the strip search was not conducted in a harassing manner intended to humiliate or cause psychological pain. The plaintiff contends that Officer Dutton and Sergeant Ferstl violated his Eighth Amendment rights by conducting the strip search in a harassing manner intended to humiliate and cause psychological pain. According to the plaintiff, any reasonable juror can consider the videos in evidence and conclude that his rights were violated and he also states that Anderson, Fosshage, Ferstl, and Dutton acted without a legitimate justification due to the evidence provided that the plaintiff was compliant.

A strip search of a prisoner violates the Eighth Amendment if it is "maliciously motivated, unrelated to institutional security, and hence totally without penological justification." *Chatman v. Gossett*, 766 F. App'x 362, 364 (7th Cir. 2019) (quoting *Whitman v. Nesic*, 368 F.3d 931, 934 (7th Cir. 2004)). A strip search is penologically justified when it is reasonably related to finding contraband that threatens the safety and security of the prison. *Id.* (citing *Peckham v. Wis. Dep't of Corr.*, 141 F.3d 694, 695, 697 (7th Cir. 1998); *Del Raine v. Williford*, 32 F.3d 1024, 1029, 1041 (7th Cir. 1994)); *see also Bell v. Wolfish*, 441 U.S. 520, 550-51 (1979).

9

In addition to the reason for the strip search, "[p]rison authorities violate the Eighth Amendment when they treat inmates in a way that is 'motivated by a desire to harass or humiliate' or 'intended to humiliate and cause psychological pain.'" *Chatman v. Ill. Dep't of Corr.*, 685 F. App'x 487, 489 (7th Cir. 2017) (quoting *King v. McCarty*, 781 F.3d 889, 897 (7th Cir. 2015)). For example, strip searches conducted in front of prison officials who are members of the opposite sex, if done in a humiliating manner, may rise to the level of an Eighth Amendment violation. *Id.* (citing *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003)). Additionally, "[a]n unwanted touching of a person's private parts, intended to humiliate the victim or gratify the plaintiff's sexual desires, can violate a prisoner's constitutional rights." *Washington v. Hively*, 695, F.3d 641, 643 (7th Cir. 2012). To overcome summary judgment, the plaintiff must furnish evidence suggesting that the defendants conducted the searches "in a harassing manner intended to humiliate and inflict psychological pain." *Chatman v. Gossett*, 766 F. App'x at 364 (quoting *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003)).

Under DOC policy, a strip search is mandatory before an inmate is placed in a RHU control cell. The defendants were following DOC policy by conducting the plaintiff's strip search before he was placed in the RHU and the record does not support a finding that the search was done for an improper reason, unrelated to a legitimate penological purpose.

The video evidence also does not support the plaintiff's assertion that the search was conducted in a harassing manner. Rather, it demonstrates that the officers conducted the search in measured and appropriate manner. The informed him of what they were doing during the search. The search was conducted at the end of a hallway and it was

10

done quickly. Right after the search, the plaintiff was given a towel to wrap around his waist. The plaintiff asserts that he observed other male staff members in the area who could have recorded the search, instead of the female Officer Dutton. The video footage does not demonstrate that the plaintiff objected to Officer Dutton's presence or substantiate his claims that the strip search was conducted in front of her in a humiliating manner. Moreover, Officer Dutton did not conduct the strip search, she recorded it. The back of the plaintiff was facing the camera for the entirely of the search. After the search was completed, he was given a towel and only then did he turn around and face the camera. And while there were brief moments in which the towel failed to cover the plaintiff, these brief seconds were quickly blocked from the camera's view by other officers. Regardless, plaintiff has pointed to no evidence that the search was conducted without a legitimate penalogical purpose and "the strip search of a male prisoner in front of female officers, if conducted for a legitimate penalogical purpose, would fail to rise to the level of an Eighth Amendment violation." *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003). No reasonable factfinder could conclude that the strip search violated the plaintiff's constitutional rights.

**C. Conditions of Confinement**

　　1.　　Exhaustion of Administrative Remedies

The defendants contend that, according to a review of the plaintiff's Inmate Complaint History Report, the plaintiff failed to exhaust his administrative remedies as to his conditions of confinement claim that the RHU cell he was placed in was dirty. The plaintiff contends that he did file an inmate complaint that raised the issue of the conditions of the cell he was placed in. He says that his inmate complaint CCI-2019-10692,

11

complained about the conditions of his cell. The parties did not include the actual inmate complaint in their summary judgment briefing materials.[6]

The Prison Litigation Reform Act (PLRA) provides that an inmate cannot assert a cause of action under federal law "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo*, 548 U.S. 81, 93 (2006) (holding that the PLRA requires proper exhaustion of administrative remedies). Exhaustion requires that an inmate comply with the rules applicable to the grievance process at the inmate's institution. *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). Because exhaustion is an affirmative defense, the defendants bear the burden of proving that the plaintiff failed to exhaust. *Pavey v. Conley*, 544 F.3d 739, 740-41 (7th Cir. 2008) (citing *Jones v. Bock*, 549 U.S. 199, 216 (2007)).

The Inmate Complaint Review System (ICRS) within the Wisconsin prisons is the administrative remedy available to inmates with complaints about prison conditions or the actions of prison officials. Wis. Admin. Code § DOC 310.01(2)(a). Before an inmate may commence a civil action, the inmate shall exhaust all administrative remedies that the DOC has promulgated by rule. Wis. Admin. Code § DOC 310.05. The ICRS is available for inmates to "raise issues regarding policies, living conditions, or employee actions that personally affect the inmate or institution environment." Wis. Admin. Code § DOC 310.06(1). To exhaust administrative remedies in Wisconsin, the inmate must file a

---

[6] The plaintiff's unauthorized sur-reply (*see* ECF No. 66, denying plaintiff's motion to file sur-reply) does include his inmate complaint and appeal from CCI-2019-10692. These materials show that the plaintiff's inmate complaint and appeal complained of the conditions in the RHU cell. ECF No. 67-1 at 19, 30. However, I need not consider these materials to resolve the exhaustion issue.

complaint with the institution complaint examiner within fourteen calendar days of the incident. Wis. Admin. Code § DOC 310.07(2). Each complaint may contain only one clearly identified issue and it must contain sufficient information for the department to investigate and decide the complaint. Wis. Admin. Code § DOC 310.07(5), (6). An inmate may appeal the decision on the inmate complaint within fourteen days after the date of the decision. Wis. Admin. Code § DOC 310.09(1).

The defendants included only the plaintiff's Inmate Complaint History Report in support of summary judgment on the plaintiff's conditions of confinement claim. This report merely shows a general label and summary of the complaint issue; it does not show that the inmate complaint does not also complain about other topics or issues, nor does it show how the complaint was processed and addressed by the institution. By failing to include these materials, the defendants have not shown that the plaintiff failed to exhaust on his conditions of confinement claim. I will therefore consider this claim on the merits.

2. Merits of Conditions of Confinement Claim

The defendants contend that the plaintiff's conditions of confinement were not sufficiently serious to violate his Eighth Amendment rights and that the defendants were not deliberately indifferent to his conditions of confinement. The plaintiff asserts that he was made to crawl around on the floor because his knee brace and cane were not returned to him. He says that he can show through video evidence that he complained about the filthiness of his cell. The plaintiff states that he raised the issue in his inmate complaint. He also says that Officers Fox and Bender inspected the plaintiff's cell before he was placed in it and that Fox put the "limited" property into the cell, thus they are responsible for the state of the cell and his limited access to property.

13

Case 2:19-cv-01774-LA   Filed 09/22/21   Page 13 of 16   Document 68

To establish a constitutional violation with respect to prison living conditions, an inmate must be able to demonstrate both: (1) the conditions were so adverse that they deprived him "of the minimal civilized measure of life's necessities" (the claim's objective prong) and (2) the defendant acted with deliberate indifference with respect to the conditions (the claim's subjective prong). *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (quoting *Farmer v. Brennan*, 511 U.S. 832, 834 (1994)). The necessities of life include "reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities." *Gray*, 826 F.3d at 1005 (quoting *Lewis v. Lane*, 816 F.2d 1165, 1171 (7th Cir. 1987)). Although "extreme deprivations are required," *Delaney v. DeTella*, 256 F.3d 679, 683 (7th Cir. 2001), and "routine discomfort[s]" do not suffice, *Hudson v. McMillian*, 503 U.S. 1, 9 (1992), "[s]ome conditions . . . may establish an Eighth Amendment violation in combination when each alone would not do so," and other conditions that may not be sufficiently serious for a short period of time, "can become an Eighth Amendment violation . . . if endured over a significant time." *Gray*, 826 F.3d at 1005 (citations omitted). "Deliberate indifference . . . means that the official knew that the inmate faced a substantial risk of serious harm, and yet disregarded that risk by failing to take reasonable measures to address it." *Townsend*, 522 F.3d at 773. Establishing that an official acted negligently does not suffice. "Instead, the inmate must show that the official received information from which the inference could be drawn that a substantial risk existed, and that the official actually drew the inference." *Id.*

It is undisputed that when the plaintiff was placed in the RHU cell, his property was limited to a smock and a mattress. He was told he could receive additional property by displaying positive behavior. The plaintiff was placed in the RHU on May 20, 2019, and

14

he was returned to the general population on May 22, 2019. The record is not clear on whether plaintiff received additional property in his RHU cell before he was returned to general population.[7] However, it is undisputed that the plaintiff did not complain to any defendant about the conditions of his cell at the time he was placed in it or while he was in the RHU. (The plaintiff inmate complaint CCI-2019-10692 was received by staff on June 14, 2019, well after the plaintiff had been returned to the general population. ECF No. 53-1) Moreover, the plaintiff does not describe a level of uncleanliness that would have been obvious to the defendants when they placed him in the cell.[8] Based on this record, a jury could not conclude that any defendant acted with deliberate indifference to any condition in the plaintiff says he was subjected to in his RHU cell. I will therefore grant the defendants' motion for summary judgment as to the plaintiff's conditions of confinement claim.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the defendants' motion for summary judgment (ECF No. 47) is **GRANTED**.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment. *See* Federal Rules of Appellate

---

[7] The plaintiff states that he was denied property items such as toilet paper, soap, and shoes until about twenty-eight hours after he was placed in the RHU cell. ECF No. 60 at 11. He did not submit a sworn declaration regarding this statement.

[8] The plaintiff states that the floor was dirty and contained "dust bunnies" and that the sink and toilet were "filthy and grimy." ECF No. 60 at 12. However, the plaintiff did not submit a sworn statement regarding these assertions.

15

Procedure 3 & 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within 28 days of the entry of judgment. Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend either of these deadlines. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin, this 22nd day of September, 2021.

s/Lynn Adelman_____
LYNN ADELMAN
United States District Judge
